# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | CASE NO. 09 B 02895 |
| FELICIA M. DANGERFIELD, | CHAPTER 7 |
| Debtor. | |
| KRISTIL HAYES, | |
| Plaintiff, | ADVERSARY NO. 09-00339 |
| v. | |
| FELICIA M. DANGERFIELD, | |
| Defendant. | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW

THIS MATTER HAVING COME BEFORE THE COURT on June 30, 2009, on Plaintiff's Motion for Default Judgment, Defendant having failed to answer or otherwise respond to Plaintiff's Complaint or to appear in court, Plaintiff having appeared by her attorneys, Kevin P. O'Flaherty and Appel & Kelly, Ltd., and having submitted her affidavit verifying the allegations of the Complaint and proving damages, the court enters the following:

I.  FINDINGS OF FACT:

1. Kristil Hayes ("Hayes") is a resident of the state of Illinois.

2. Felicia M. Dangerfield ("Dangerfield") is a natural person residing at 1809 S. Komensky, Chicago, Illinois.

3. In January, 2006, Larry Avant ("Avant") a pastor for Hayes' church, told Hayes that he also worked for Icon Investment Group ("Icon"), locating real estate properties for purchase by Icon and its investors. Avant explained to Hayes that Icon was in the business of building interested investors' credit, helping them to earn money by investing in real estate, and helping individuals to purchase homes and /or rental properties. Avant represented to Hayes that

16

investing in real estate with Icon would allow Hayes to establish her credit, and that there was no risk in the investment.

4. On the recommendation of Avant, Hayes agreed to meet with Barry Morrison ("Morrison") at Icon's offices at 21141 Lincoln Highway in Matteson, Illinois.

5. On February 28, 2006, Hayes met with Morrison and Avant at Icon's offices. In the meeting, Morrison represented to Hayes that Icon would locate properties for Hayes to purchase in her own name based upon her good credit score, and that at closing she would receive a cash payment based upon the purchase price of the real estate. Avant concurred in Morrison's representation.

6. In the meeting of February 28, 2006, Morrison represented to Hayes that Icon would perform any and all repairs on properties which Hayes might purchase, at Icon's expense. Avant concurred in Morrison's representation.

7. In the meeting of February 28, 2006, Morrison represented to Hayes that Icon would be responsible for renting and managing any properties purchased by Hayes, together with taxes and utilities. Avant concurred in Morrison's representation.

8. In the meeting of February 28, 2006, Morrison represented to Hayes that Hayes would have the option of either keeping a property, or having Icon repurchase the property after a period of three to six months. Morrison represented to Hayes that if she elected to have Icon repurchase the real estate, Hayes would effectively be no more than an outside investor in the real estate purchased, and would not be at risk.

9. On February 28, 2006 Hayes was introduced to Felicia Dangerfield, who Morrison represented worked with Morrison and Icon in their real estate investment program. Dangerfield maintained offices in the same office suite as Morrison and Icon.

10. In early March, 2006 Dangerfield requested several verifications from Hayes as to the status of her student loan deferments.

11. In the second week of March, Dangerfield called Hayes and told Hayes that she needed to obtain employment verification from her UPS co-workers, and needed phone numbers at UPS for contact information. Dangerfield also asked Hayes to provide her with a copy of Hayes' two most recent pay stubs from UPS. Hayes gave the information to Avant for delivery to Dangerfield.

12. In March, 2006, Jason Brodsky ("Brodsky"), a branch manager for First Capital Mortgage Corp.'s offices at 1000 North Halsted, Chicago, Illinois ("First Capital"), and Cynthia Woodcox ("Woodcox"), a loan processor with First Capital Mortgage Corp. supervised by Brodsky, for their own financial benefit and unbeknownst to Hayes, initiated with First Capital the loan application process required to approve Hayes for a mortgage loan for the purchase of the real estate at 1310 East 93rd Street, Chicago, Illinois ("the Property").

13. At all times relevant to the Complaint until the Property was sold to Hayes, the Property was, unbeknownst to Hayes, owned by Woodcox.

14. In connection with obtaining loan approval for Hayes, Brodsky, unbeknownst to Hayes, signed a Mortgage Loan Origination Agreement and a Loan Brokerage Agreement purportedly signed by Hayes.

15. In March, 2006, Brodsky and Woodcox ordered a credit report on Hayes.

16. In March, 2006, Brodsky and Woodcox, unbeknownst to Hayes, ordered an appraisal of the Property from Theodore Pendleton Jr.

17. In March or April, 2006, Brodsky and Woodcox, unbeknownst to Hayes, completed a Uniform Residential Loan Application for Hayes. The Loan Application was signed by Brodsky on behalf of First Capital.

18. Between February 28, 2006 and May 25, 2006, Dangerfield took certain actions to qualify Hayes for a loan for which she knew she did not qualify, including the preparation of a false and fraudulent Uniform Residential Loan Application, without disclosing her activities to Hayes and with the purpose and effect of facilitating the sale of the Property.

19. Thereafter, in March or April, 2006, Brodsky and Woodcox, unbeknownst to Hayes, submitted to First Franklin Financial Corp. the loan application and all related documents for the purpose of obtaining two loans for Hayes, one for $168,000.00, and one for $42,000.00 to enable Hayes to purchase the Property.

20. As a result of Brodsky and Woodcox' submission of the aforementioned loan application, credit report, appraisal, and other related documents to First Franklin, Hayes was approved for loans to purchase the Property.

21. Thereafter, at some point after May 8, 2006, Hayes received a package from First Franklin with copies of documentation for two loans to be made on the Property.

22. When Hayes told Avant she had received the documents from First Franklin, and was not sure what they were, Avant told her that the Property was in fact the one identified by Icon for her purchase, and that Dangerfield should have called her about it.

23. Thereafter, Hayes called Dangerfield on the telephone, and Dangerfield introduced her Woodcox in a three-way telephone conference. Dangerfield represented to Hayes that Woodcox worked with Icon, and that Woodcox would be handling Hayes' loan for her investment in the Property.

24. In May, Avant spoke with Hayes about her purchase of the real estate, and again reiterated to Hayes that Dangerfield, Morrison, and Woodcox were "good people", that he had seen their work, and that the Property was in good shape.

4

25. On May 25, 2006, at the instruction of Woodcox, Hayes went to Tinley Park, Illinois for the closing.

26. Present at the closing were attorney Dana Thomas, Woodcox, and Avant.

27. During the closing, the closer with Stewart Title presented Hayes with a completed Uniform Residential Loan Application from First Capital. Hayes was instructed by the closer to sign the form in the appropriate signature blocks. Hayes followed her instructions.

28. When presented with an "Occupancy Declaration" in the course of the closing, Hayes told the closer that she was purchasing the Property as investment property, and did not intend to occupy the Property as her principal residence. The closer called First Franklin, the lender, and advised them of this fact. Woodcox then spoke with a representative of First Franklin, advising the representative that Hayes was mistaken, she did not understand, and that Hayes in fact intended to occupy a first floor unit.

29. After hanging up with the lender, Woodcox then told Hayes that it "had to be done that way for insurance purposes," and it didn't really make any difference, as Hayes would be selling the property in sixty days. Relying on Woodcox' experience, and believing that Woodcox was representing Hayes' interests, Hayes agreed to sign the Declaration.

30. In the course of the closing, Hayes received an Affidavit of Title and a Bill of Sale.

31. At the closing, a check was issued to Hayes in the amount of $4,803.45, which Woodcox, Thomas, and Avant represented constituted security deposits for the tenants in the amount of $1,800.00, and $3,003.45 towards the $7,000.00 under the Property Rate Sheet. Hayes was told by Woodcox, Thomas and Avant that she could pick up the rest of her money the following Tuesday at Icon's offices.

32. At or after the closing, checks were also issued to First Capital, Woodcox, Dangerfield, and Avant.

33. At the closing, Hayes did not receive any keys to the property, any tenant leases, any assignment of tenant leases, or copies of tenant letters advising the tenants of the sale to Hayes. This was consistent with Hayes' belief that Icon and Morrison were to be responsible for managing the property.

34. On the Wednesday following the closing, Avant gave Hayes a check at work in the approximate amount of $3,500.00, which amount was intended to make up the balance due Hayes under the Property Rate Sheet.

35. During the first week of June, 2006, Hayes called Dangerfield and told her that she had not yet received her two rent payments for payment of the mortgage with First Franklin. At that point, Hayes was told by Dangerfield and Morrison that the real estate she had purchased was in fact not part of Icon's "program," did not fall under her February 28th agreement with Icon, and that she should call Woodcox and get keys to the building, the lease agreements, and the tenant payments. In the conversation, both Morrison and Dangerfield told Hayes that Icon had no responsibility for the Property. Approximately three to four weeks after the closing, a set of keys to the Property was given to Hayes at the Property.

36. At all times in the purchase process of the Property, Hayes believed that she was the "client" of Icon and Morrison as represented in the agreement, and that her interests were being represented by Icon, Morrison, Dangerfield, and Woodcox.

37. At all times in the purchase process of the Property, Hayes believed that she was purchasing the Property pursuant to the terms of her agreement with Morrison and Icon.

38. At no point in time in the purchase process of the Property did Hayes ever sign a real estate sales contract or tender any earnest money in connection with the purchase of the Property.

39. At no point in time in the purchase process of the Property prior to closing did Hayes ever sign any documents in connection with any loan application package or any related documents, sign any Uniform Residential Loan Application, or answer any questions in response to such an application.

40. At no point in time before or after the closing did Avant, Dangerfield, Morrison, First Capital, Woodcox or Brodsky disclose to Hayes that Woodcox was the owner and seller of the Property.

41. At no point in time prior to the purchase of the property did Dangerfield, Avant, Morrison, Woodcox, or Brodsky disclose to me that the Property was not being purchased pursuant to the terms of Hayes' February 28th agreement with Icon and Morrison, or that no one was representing Hayes' interests in the purchase of the Property.

42. In purchasing the property, Hayes relied on the incorrect belief created by Dangerfield, Morrison, Avant, Woodcox, and Brodsky:

   (a)   that the Property sale and loan were pursuant to Hayes' agreement with Icon;

   (b)   that Woodcox was affiliated with, and an agent of Icon, and that she represented Hayes' interests, rather than her own, with respect to the Transaction;

   (c)   that the Property was accurately valued at the selling price;

   (d)   that the Property complied with the Chicago Building Code;

   (e)   that the Property did not contain tenants in default of their rent obligations; and

   (f)   that the loan for the purchase of the Property was one for which Hayes qualified and which she could afford on her income.

Case 09-00339    Doc 16-1    Filed 06/30/09    Entered 07/01/09 10:15:55    Desc Attach
Correct PDF    Page 8 of 16

09-00339:13.2:Motion for Default Judgment:Proposed Order Proposed Findings of Fact & Conclusions of Law Entered: 6/23/2009 5:32:26 PM by:Kevin O&#039;Flaher

43. As a result of the above actions and omissions by Dangerfield, Morrison, Woodcox, Avant, and Brodsky, Woodcox obtained the purchase price of the property at a fraudulently inflated value as well as commissions and fees in an amount between $3,000 and $5,000 in relation to the fraudulently obtained loan.

44. As a result of the above actions and omissions by Dangerfield, Morrison, Woodcox, Avant, and Brodsky:

   (a) Hayes purchased a property which was significantly overvalued, which would not be managed, maintained, and rented by a third party;

   (b) Hayes became obligated on certain mortgage notes with First Franklin in the amounts of $160,000, and $40,000, with respect to which she is now in default;

   (c) Hayes was found liable to the City of Chicago, on May 5, 2008, for water bills for the Property, in the amount of $608.22, which were, unbeknownst to Hayes, based on a flat rate.

   (d) Hayes incurred attorney fees in the amount of $3,682.50 in *City of Chicago v. Hayes*, No. 08WD00496A, which related to delinquent water bills for the Property.

   (e) Hayes incurred attorney fees in the amount of $1,825.00 in *City of Chicago v. Accredited Home Lenders, Inc.*, No. 06M1401346, which related to the Property's building code violations.

   (f) Hayes incurred attorney fees in the amount of $600.00 in *Deutsche Bank Nat'l Trust Co. v. Hayes*, No. 06 CH 28024, which related to foreclosure of one of the mortgages on the property.

45. On May 15, 2007, a judgment of foreclosure was entered on the $160,000 mortgage loan for the Property. The Property was subsequently sold at a judicial sale. Although no deficiency judgment was sought against Hayes on the $160,000 loan, Hayes remains liable for the full amount of the $40,000 loan procured by Woodcox and Brodsky, plus interest.

46. Service of Plaintiff's complaint and summons was made upon Defendant on April 20, 2009 by regular first class United States mail, postage fully pre-paid, addressed to Felicia M.

Dangerfield, 1809 S. Komensky, Chicago, IL 60623.

47. As of the date of this order, no answer or responsive pleading has been filed by Defendant and Defendant has not appeared before this court.

CONCLUSIONS OF LAW

1. Defendant has failed to answer the allegations of the Complaint within the time required by Bankruptcy Rule 7012.

2. Defendant's failure to answer the allegations of the Complaint within the time required by Bankruptcy Rule 7012 constitutes an admission of such allegations. Matter of Magafici, 16 B.R. 246, 248 (N.D. Ill. 1981).

3. Between January of 2006 and March 2006 Dangerfield entered into an agreement with Cynthia Woodcox ("Woodcox"), Barry Morrison ("Morrison"), Larry Avant ("Avant"), and Jason Brodsky ("Brodsky") (collectively "the Conspirators") for the unlawful purpose of fraudulently inducing Hayes to purchase the real estate at 1310 East 93rd Street, Chicago, Illinois ("the Property") at an inflated price ("the Conspiracy"), in furtherance of which the Conspirators committed the following overt tortious acts. Such agreement constituted a civil conspiracy, pursuant to In re: Restaurant Development Group, Inc., 397 B.R. 891, 896-897 (N.D. Ill. 2008).

4. Dangerfield's representation to Kristil Hayes, shortly after May 8, 2006, that Woodcox was an agent of icon, was a false representation of fact, which Dangerfield knew to be false when made, which was made with an intent to deceive Hayes, and upon which Hayes justifiably relied in purchasing the Property. Therefore, pursuant to In re Burke, 398 B.R. 608, 623 (Bkrtcy, N.D. Ill. 2008), such representation constitutes fraud withing the meaning of 11 U.S.C. § 523(a)(2)(A).

5. Dangerfield is directly responsible for the following deliberately misleading

9

omissions, upon which lack of information Hayes justifiably relied, and which, therefore, pursuant to the ruling in McClellan v. Cantrell,, 217 F.3d 890, 892 (7th Cir. 2000), constitute fraud within the meaning of 11 U.S.C. § 523:

 (a) failing to disclose to Hayes that Dangerfield had taken certain actions to qualify Hayes for a loan for which she knew Hayes did not qualify, including the preparation of a false and fraudulent Uniform Residential Loan Application, with the purpose and effect of facilitating the sale of the Property while concealing the nature of such sale from Hayes;

 (b) failing to disclose that Woodcox was the owner of the Property prior to closing, with the purpose and intent of facilitating the sale of the property while concealing the nature of such sale from Hayes; and

 (c) failing to disclose to Hayes that no one was representing her interests in the purchase of the property, with the purpose and intent of facilitating the sale of the property while concealing the nature of such sale from Hayes.

6. 11 U.S.C. § 523(a)(2)(A) includes "debts which arise from the wrongful acts of conspirators and their co-conspirators." Aetna Casualty and Surety Company v. Markarian, 228 B.R. 34, 39 (1st Cir. 1988).

7. Dangerfield is liable for the following misrepresentations by Avant, made between February 1, 2006 and May 25, 2006, which Avant knew to be false, which were made in furtherance of the conspiracy, and upon which Hayes justifiably relied in purchasing the Property:

 (a) representing to Hayes that Woodcox was affiliated with and an agent of Icon and failing to disclose that to Hayes that Hayes was not Woodcox' "client" pursuant to the February 28th agreement with Icon;

 (b) representing to Hayes that Icon would perform any and all repairs on properties which Hayes might purchase, at Icon's expense;

 (c) representing to Hayes that Icon would be responsible for renting and managing any properties purchased by Hayes, together with taxes and utilities;

 (d) representing to Hayes that Hayes would have the option of either keeping a property, or having Icon repurchase the property after a period of three to six months;

Case 09-00339  Doc 16-1  Filed 06/30/09  Entered 07/01/09 10:15:55  Desc Attach Correct PDF  Page 11 of 16

09-00339:13.2:Motion for Default Judgment:Proposed Order Proposed Findings of Fact & Conclusions of Law Entered: 6/23/2009 6:32:26 PM by:Kevin O&#039;Flaher

 (e) representing to Hayes that the Property was in good shape; and

 (f) representing to Hayes that Woodcox would be assisting her in the purchase of the Property and in processing her loan.

8. Dangerfield is liable for the following omissions by Avant, which Avant omitted with the intent to deliberately mislead Hayes in order to induce Hayes to purchase the property while concealing the nature of the sale from Hayes, which were omitted in furtherance of the conspiracy, and upon which lack of information Hayes justifiably relied in purchasing the Property:

 (a) failing to disclose that Woodcox was the owner of the Property;

 (b) failing to disclose to Hayes that the property was not being purchased pursuant to the terms of her February 28th agreement with Icon;

 (c) failing to disclose to Hayes that no one was representing her interests in the purchase of the Property, and to advise Hayes that she should be represented by counsel in the transaction;

 (d) failing to tell Hayes that it was inappropriate for her to sign the Legal Occupancy Declaration in connection with her loan so as to enable Hayes to complete the purchase of the Property, knowing that a false declaration triggered an immediate default under the loan and allowed the lender to immediately foreclose; and

 (e) failing to disclose to Hayes that the Property was in violation of many provisions of the Chicago Building Code.

9. Dangerfield is liable for the following misrepresentations by Morrison, made between February 1, 2006 and May 25, 2006, which Morrison knew to be false, which were made in furtherance of the conspiracy, and upon which Hayes justifiably relied in purchasing the Property:

 (a) representing to Hayes that Woodcox was affiliated with and an agent of Icon;

 (b) representing to Hayes that Icon would perform any and all repairs on properties which Hayes might purchase, at Icon's expense;

 (c) representing to Hayes that Icon would be responsible for renting and managing any properties purchased by Hayes, together with taxes and utilities; and

11

Case 09-00339    Doc 16-1    Filed 06/30/09    Entered 07/01/09 10:15:55    Desc Attach
Correct PDF    Page 12 of 16

09-00339:13.2:Motion for Default Judgment:Proposed Order Proposed Findings of Fact & Conclusions of Law Entered: 6/23/2009 5:32:26 PM by:Kevin O&#039;Flaher

    (d)    representing to Hayes that Hayes would have the option of either keeping a property, or having Icon repurchase the property after a period of three to six months.

10.    Dangerfield is liable for the following omissions by Morrison, which Morrison omitted with the intent to deliberately mislead Hayes in order to induce Hayes to purchase the property while concealing the nature of the sale from Hayes, which were omitted in furtherance of the conspiracy, and upon which lack of information Hayes justifiably relied in purchasing the Property:

    (a)    failing to disclose that Woodcox was the owner of the Property prior to closing;

    (b)    failing to disclose to Hayes that the Property was not being purchased pursuant to the terms of her February 28th agreement with Icon and Morrison; and

    (c)    failing to disclose to Hayes that no one was representing her interests in the purchase of the Property.

11.    Dangerfield is liable for the following misrepresentations by Woodcox, made between February 1, 2006 and May 25, 2006, which Woodcox knew to be false, which were made in furtherance of the conspiracy, and upon which Hayes justifiably relied in purchasing the Property:

    (a)    representing to Hayes that she was affiliated with and an agent of Icon;

    (b)    representing to Hayes that it was appropriate for her to sign the Legal Occupancy Declaration in connection with her loan so as to enable Hayes to complete the purchase of the Property, knowing that a false declaration triggered an immediate default under the loan and allowed the lender to immediately foreclose;

    (c)    providing Hayes with a false Affidavit of Title for the Property; and

    (d)    representing to Hayes that she, Woodcox, represented Hayes' interests in the purchase of the property.

12.    Dangerfield is liable for the following omissions by Woodcox, which Woodcox omitted with the intent to deliberately mislead Hayes in order to induce Hayes to purchase the property while concealing the nature of the sale from Hayes, which were omitted in furtherance

of the conspiracy, and upon which lack of information Hayes justifiably relied in purchasing the Property:

    (a)    failing to disclose to Hayes that she, Woodcox, was the owner of the Property;

    (b)    failing to disclose to Hayes that the Property was not being purchased pursuant to the terms of her February 28th agreement with Icon;

    (c)    failing to disclose to Hayes that the Property was in violation of many provisions of the Chicago Building Code;

    (d)    failing to disclose to Hayes that the tenants in the Property had not paid rent for months, and that Woodcox had executed and served at least one tenant with a "Notice to Pay Rent or Quit" just three days before the closing; and

    (e)    failing to disclose to Hayes that no one was representing her interests in the purchase of the Property;

    (f)    failing to disclose to Hayes that she had ordered an appraisal from Pendleton which she knew would be inaccurate and which would artificially inflate the value of the Property;

    (g)    failing to disclose to Hayes that Woodcox had prepared and signed Hayes' name to a real estate sales contract for the Property without Hayes' knowledge or consent;

    (h)    failing to disclose to Hayes that Woodcox had prepared a false Uniform Residential Loan Application on behalf of Hayes so as to allow Hayes to qualify for a loan for the purchase of the Property, without Hayes' knowledge or consent;

    (i)    failing to disclose to Hayes that Woodcox had not provided her with a copy of the title commitment;

    (j)    failing to disclose to Hayes that Woodcox had not provided her with a copy of the real estate sales contract for the sale of the Property;

    (k)    failing to disclose to Hayes that Woodcox had used false documents to qualify Hayes for a loan for which Woodcox knew Hayes did not qualify;

    (l)    failing to disclose to Hayes that Woodcox had falsified the RESPA Statement at the closing to show that Hayes had paid earnest money of $2,000.00, when no earnest money had ever been paid;

    (m)    failing to disclose to Hayes that Woodcox had undertaken to act and had held First Capital out as Hayes' agent or contractor for the purpose of obtaining a mortgage loan for Hayes without her knowledge;

(n) failing to disclose to Hayes that Woodcox prepared and signing Hayes' name to a Mortgage Loan Origination Agreement and a Loan Brokerage Agreement without Hayes' knowledge or consent;

(o) failing to disclose to Hayes that Woodcox had prepared and signed Hayes' name to the forms in First Capital's "Loan Application Package", including Borrower's Certification and Authorization, Adjustable Rate Mortgage Disclosures, Loan Brokerage Disclosure Statement Mortgage Escrow Account Disclosure, Notice to Applicant of Right to Receive Copy of Appraisal, Loan Servicing Disclosure Statement, Equal Credit Opportunity Act Notice, Pre-Payment Penalty Disclosure, Disclosure Statement / Controlled Business Arrangement, Request for Transcript of Tax Return, and Credit Score Disclosure without Hayes' knowledge or consent;

(p) failing to disclose to Hayes that Woodcox had prepared a fictitious "Request for Verification of Rent or Mortgage" form using the name of a non-existent entity;

(q) failing to disclose to Hayes that Woodcox had prepared a Uniform Residential Loan Application containing false information concerning Hayes, including information as to Hayes' living expenses, income, bank accounts, personal assets, whether she would occupy the Property as a principal residence, and a purported "face-to-face" interview in obtaining such information;

(r) failing to disclose to Hayes that Woodcox had completed, signed, and submitted all of the above documents and the appraisal from Pendleton to First Franklin;

(s) failing to disclose to Hayes that Woodcox had used documents to which Hayes' signature was forged to obtain personal and confidential information about Hayes, including employment information, credit scores, and similar information without disclosing her activities to Hayes, with the purpose and effect of using such information to facilitate the Property sale while concealing the nature of the sale from Hayes; and

(t) failing to disclose to Hayes that Woodcox had falsely represented to First Franklin that Hayes had put down the sum of $2000 as earnest money knowing that no earnest money had been paid.

12. Dangerfield is liable for the following omissions by Brodsky, which Brodsky omitted with the intent to deliberately mislead Hayes in order to induce Hayes to purchase the property while concealing the nature of the sale from Hayes, which were omitted in furtherance of the conspiracy, and upon which lack of information Hayes justifiably relied in purchasing the Property:

(a) failing to disclose to Hayes that Brodsky had prepared and signed Hayes' name to a real estate sales contract for the Property;

(b) failing to disclose to Hayes that Brodsky had prepared a false Uniform Residential Loan Application on behalf of Hayes so as to allow Hayes to qualify for a loan for the purchase of the Property;

(c) failing to disclose to Hayes that Brodsky had failed to provide a copy of the title commitment to Hayes;

(d) failing to disclose to Hayes that Brodsky had failed to provide to Hayes a copy of the real estate sales contract for the sale of the Property;

(e) failing to disclose to Hayes that Brodsky had used false documents to qualify Hayes for a loan for which he knew Hayes did not qualify;

(f) failing to disclose to Hayes that Brodsky had falsified the RESPA Statement at the closing to show that Hayes had paid earnest money of $2,000.00, when no earnest money had ever been paid;

(g) failing to disclose to Hayes that Brodsky had undertaken to act and had held First Capital out as Hayes' agent or contractor for the purpose of obtaining a mortgage loan for Hayes;

(h) failing to disclose to Hayes that Brodsky prepared and signed Hayes' name to a Mortgage Loan Origination Agreement and a Loan Brokerage Agreement;

(i) failing to disclose to Hayes that Brodsky had prepared and signed Hayes' name to the forms in First Capital's "Loan Application Package", including Borrower's Certification and Authorization, Adjustable Rate Mortgage Disclosures, Loan Brokerage Disclosure Statement Mortgage Escrow Account Disclosure, Notice to Applicant of Right to Receive Copy of Appraisal, Loan Servicing Disclosure Statement, Equal Credit Opportunity Act Notice, Pre-Payment Penalty Disclosure, Disclosure Statement / Controlled Business Arrangement, Request for Transcript of Tax Return, and Credit Score Disclosure;

(j) failing to disclose to Hayes that Brodsky had prepared a fictitious "Request for Verification of Rent or Mortgage" form using the name of a non-existent entity;

(k) failing to disclose to Hayes that Brodsky had preparing a Uniform Residential Loan Application containing false information concerning Hayes, including information as to Hayes' living expenses, income, bank accounts, personal assets, whether she would occupy the Property as a principal residence, and a purported "face-to-face" interview;

(l) failing to disclose to Hayes that Brodsky had ordered an appraisal from Pendleton which he knew would be inaccurate and which would artificially inflate the value of the Property;

(m)     failing to disclose to Hayes that Brodsky had completed, signed, and submitted all of the above documents and the appraisal from Pendleton to First Franklin;

(n)     failing to disclose to Hayes that Brodsky had used documents to which Hayes' signature was forged to obtain personal and confidential information about Hayes, including employment information, credit scores, and similar information; and

(o)     failing to disclose to Hayes that Brodsky had falsely represented to First Franklin that Hayes had put down the sum of $2000 as earnest money knowing that no earnest money had been paid.

13.     The aforementioned actions by Dangerfield, Woodcox, Brodsky, Avant, and Morrison constitute fraud within the meaning of 11 U.S.C. § 523(a)(2)(A), which created a debt owed by Dangerfield to Hayes, nondischargeable in bankruptcy, in the amount of 60,540.01.

_6/30/09_                   _/s/ Judge Schmetterer_
Date                          Judge Schmetterer